**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2503-WJM-KMT

CHRISTOPHER TANTLINGER,

      Plaintiff,

v.

LOUIS DUCHAINE, individually,
BURLEIGH CASTELLO, individually, and
STEVE HARTLEY, individually and in his official capacity,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

Plaintiff Christopher Tantlinger is an inmate at the Arkansas Valley Correctional Facility in Ordway, Colorado ("Facility"), an institution operated by the Colorado Department of Corrections ("CDOC").  Tantlinger has sued certain Facility employees under 42 U.S.C. § 1983, alleging that his Eighth Amendment rights were violated when he developed a serious infection which Facility employees ignored until the infection had caused permanent damage.  (*See generally* ECF No. 14.)  Specifically, Tantlinger has sued Louis Duchaine ("Duchaine"), a facility guard; Burleigh Castello ("Castello"), another facility guard; and Steve Hartley ("Hartley"), the Facility's warden.  Tantlinger previously named a Facility nurse, Lisa Hanks, as a defendant, but later stipulated to dismiss her.  (*See* ECF No. 32.)

Currently before the Court are two motions: (1) Hartley's and Castello's Motion for Summary Judgment (ECF No. 64), and (2) Duchaine's Motion for Summary

Judgment (ECF No. 65).  For the reasons explained below, the Court finds that

Tantlinger has no evidence from which a jury could reasonably conclude that

Defendants' actions, even viewed in the light most favorable to Tantlinger, actually

caused his claimed injuries.  Summary judgment is therefore granted to all Defendants.

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence

and all reasonable inferences therefrom in the light most favorable to the nonmoving

party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In addition, the Court must resolve factual ambiguities against the moving party, thus

favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th

Cir. 1987).

## II.  FACTS

The following facts are undisputed unless attributed to one party or another.

### A.   September 19–21, 2012

On September 19, 2012, Tantlinger underwent a tooth extraction at the Facility's dental clinic.  (ECF No. 64 at 2, ¶ 4.)  Tantlinger claims that, no later than the next day, he complained to Facility guards of "severe pain (ten on a one-to-ten scale)."  (ECF No. 74 at 2–3, ¶ 5.)  In particular, on September 20, Tantlinger and a fellow inmate, Justin Hammond, visited the office of Defendant Castello.[1]  Tantlinger says that he "begged him for help, as [he] was extremely ill."  (ECF No. 74-1 at 3.)  But, he says, Castello brusquely dismissed his plea for help, telling him, "You're not a fucking doctor.  You don't make these decisions.  Get out of my office."  (ECF No. 74 at 3–4, ¶ 13.)

Hammond's recollection of this event is slightly different.  Hammond says that he had previously had a severe infection secondary to a wisdom tooth extraction at the Facility, and it required a medically induced coma and two weeks in an intensive care unit to treat.  (ECF No. 74-5 ¶ 5.)  Hammond explained this to Castello and expressed his worry that the same thing was happening to Tantlinger.  (*Id.* ¶ 6.)  Castello allegedly responded (to Hammond, not Tantlinger), "You're not a fucking doctor.  You don't make these decisions.  Get out of my office."  (*Id.*)

---

[1] The parties' memories are hazy regarding whether Castello's meeting with Tantlinger and Hammond took place on September 20, 21, or 22.  Tantlinger appears to believe that view of the facts most favorable to him would place this meeting on September 20.  (*See* ECF No. 74 at 2–3, ¶ 5.)  The Court will therefore adopt that date for purposes of this order.  It has no effect on the outcome below.

**B.      September 22, 2012**

Regardless of precisely how the meeting with Castello transpired, the parties

agree that Tantlinger went to the Facility medical clinic on September 22 and

complained of pain in his jaw.  (ECF No. 64 at 3, ¶ 5.)  It is not clear whether Tantlinger

needed permission to visit the clinic at this time, and if so, from whom he gained that

permission.  Castello does not claim credit for permitting this visit.

The clinic noted that Tantlinger had a temperature of 100.1°, "mild swelling and

slight redness at the [tooth extraction] site," and "[m]oderate swelling of the right lower

jaw, but no drainage was seen at the [extraction] site."  (*Id.* ¶ 6.)  Medical staff gave

Tantlinger ibuprofen and "referred [him] to a dentist."  (*Id.*)

A little later, apparently on the same day, Tantlinger asked Castello to allow him

to visit the medical clinic again.  (*Id.* at 4, ¶ 13.)  Castello says that he then contacted

the on-duty nurse, "conveyed Tantlinger's concerns," and "was informed by the on-duty

nurse that Tantlinger had been seen, that he was receiving treatment[,] and [that he]

should let the prescribed treatment take effect."  (*Id.* ¶¶ 13–14.)  According to Castello,

he informed Tantlinger of this outcome, but soon after, the same scene repeated itself:

Tantlinger requested to visit the clinic, Castello contacted the on-duty nurse, and the

on-duty nurse said that Tantlinger should wait for his medicine to take effect.  (*Id.* at 5,

¶ 15.)

Tantlinger disputes that Castello ever conveyed (or fully conveyed) his

complaints to the on-duty nurse.  Tantlinger has no affirmative evidence that such

communication with the on-duty nurse never happened, but he believes a jury could

4

disbelieve Castello's story for two reasons.  First, Castello "failed to write a single report relating to Tantlinger's medical situation in late September 2012 despite knowing he had a duty to document [a] prisoner's medical conditions in certain circumstances." (ECF No. 74 at 3–4, ¶ 13.)  Second, the fact that Castello allegedly responded to Tantlinger's earlier plea for assistance with antipathy ("You're not a fucking doctor . . . .") is evidence from which a jury could conclude that Castello would do so again.

C.     **September 23, 2012**

Tantlinger went back to the Facility medical clinic on September 23 due to increased pain and swelling of the jaw and neck.  (*Id.* ¶ 7.)  Again, it is not clear whether Tantlinger needed permission to visit the clinic at this time, and if so, from whom he gained that permission.  Castello still does not claim credit.

In any event, on the 23rd, Tantlinger had a temperature of 100.5°, "reported difficulty swallowing," and "stated he was unable to eat or drink and was unable to open his mouth." (*Id.*)  Tantlinger also claims that he was having difficulty breathing at the time, was expectorating blood-tinged phlegm, and could not open his mouth wide enough for a throat examination.  (ECF No. 74 at 3, ¶ 7.)  Facility medical staff sent Tantlinger to the emergency department at a Pueblo hospital.  (ECF No. 64 at 3, ¶ 8.)

At the emergency department, Tantlinger received an IV with fluids, corticosteroids, antinausea medication, and narcotic painkillers.  (*Id.* ¶ 9.)  He was discharged back to the Facility with a prescription for Vicodin and a high dosage of ibuprofen.  (*Id.*)  Tantlinger believes he was also prescribed antibiotics.  (ECF No. 65-1 at 6, 14.)

5

**D.     September 24, 2012**

On the evening of September 24, 2012, Tantlinger lined up in "Medline," which he describes as the process by which prisoners receive their prescription medications from a Facility nurse.  (ECF No. 65 at 3, ¶ 5.)  Tantlinger was the last inmate in Medline that evening.  (*Id.* ¶ 6.)  He requested the antibiotics he believed had been prescribed to him at the hospital, and was informed by the nurse that he never went to the hospital and was never prescribed antibiotics.  (*Id.* ¶¶ 6–7.)  The nurse then shut the window through which she was interacting with Tantlinger.  (*Id.* ¶ 7.)

Defendant Duchaine, a prison guard, was standing "five or six feet away" from this conversation between Tantlinger and the nurse.  (*Id.* at 4, ¶ 8.)  Tantlinger turned to Duchaine and said, "Is there a way you can bring my medicine?  I'm dying.  I need your help."  (*Id.* ¶ 9.)  Tantlinger claims that Duchaine responded, "I hope you fucking die. Get your ass up to your house."  (*Id.* ¶ 10.)  This interaction lasted "two or three seconds."  (*Id.* ¶ 11.)

Duchaine denies having spoken to Tantlinger in this way.  Nonetheless, an inmate at the Facility had killed a prison guard earlier that day.  (ECF No. 75 at 4, ¶ 5.) The guard had been one of Duchaine's personal acquaintances, and Duchaine admits having said "something to the effect of 'I could care less if they [the inmates] all die' on or about September 24."  (*Id.*)[2]

---

[2] No party provides evidence of the context in which Duchaine made this statement. Tantlinger cites deposition testimony in support, but fails to attach the cited pages.  (*See id.*) Duchaine nonetheless admits that he made the statement, but without explaining the context, audience, or any other relevant details.  (ECF No. 82 at 8–9.)

E.      **September 25, 2012**

Tantlinger went to Medline the following day, September 25, and received his medications.  (ECF No. 65 at 4, ¶ 12.)  He does not say whether he received antibiotics, but also does not claim that he received anything other than what he expected.

Tantlinger continued to complain of ongoing pain, but made no such complaints to Duchaine.  (*Id.* ¶ 13.)  Tantlinger says that he continued to direct his complaints to Castello, who (according to Tantlinger) saw that Tantlinger was "so sick and in so much pain that he could barely get out of bed."  (ECF No. 74 at 5, ¶ 18.)  Castello denies that he was even at the Facility on September 25.  (ECF No. 83 at 2–3, ¶ 18.)  Castello admits, however, that in the preceding couple of days, he could see that "something was wrong" with Tantlinger, and that Tantlinger's pain was "obvious."  (ECF No. 74 at 5, ¶ 18.)

F.      **September 26, 2012 and Later**

On September 26, 2012, the Facility dental clinic examined Tantlinger and diagnosed him with Ludwig's angina.[3]  (ECF No. 64 at 4, ¶ 10.)  For a third time, it is not clear whether Tantlinger needed permission to visit this clinic, and if so, from whom he gained that permission.  Castello again does not claim credit.

By this point, Tantlinger's case was evidently grave because he was once again sent to an emergency department in Pueblo, underwent emergency surgery, and received antibiotics.  (*Id.*)  He remained in the hospital for a few days, and then was

---

[3] "Ludwig's angina is an infection of the floor of the mouth under the tongue.  It is due to bacteria."  U.S. National Library of Medicine, https://medlineplus.gov/ency/article/001047.htm (last accessed Aug. 15, 2016).

flown to a Denver hospital for a fluid drainage procedure that required the special training of a cardiothoracic surgeon.  (*Id.* ¶¶ 11–12.)

Tantlinger has recovered from his infection but has lingering physical impairments, including slurred speech due to partial paralysis of the tongue and vocal cords.  (ECF No. 74 at 12, ¶ 11.)  Tantlinger's expert opines that the lingering paralysis and most of the other acute symptoms that Tantlinger experienced could have been avoided: "The initial lack of referral by [CDOC] staff and resultant lack of response by a treating dentist on 9-20-12 set off a chain of events which ultimately led to the life threatening long-term intensive care treatment of Mr. Tantlinger and his debilitating vocal cord and tongue paralysis."  (ECF No. 74-7 at 4.)

## III.  ANALYSIS

The Eighth Amendment protects against the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  The Eighth Amendment's prohibition against cruel and unusual punishment encompasses deliberate indifference by prison officials to objectively serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Objectively serious medical needs are those that have "been diagnosed by a physician as mandating treatment or [are] so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (internal quotation marks omitted).  A prison official is deliberately indifferent to such a need when the official "knows of and disregards [the medical need]; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

8

inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Tantlinger claims that Castello and Duchaine delayed and denied access to necessary medical care, thus allegedly denying his Eighth Amendment rights. Tantlinger claims that Hartley shares responsibility for that denial because Hartley allegedly failed to train and supervise Facility guards, and thereby created an environment where the alleged violation of Tantlinger's rights was inevitable.

Because Hartley's liability turns on whether Tantlinger suffered an Eighth Amendment deprivation, the Court will first analyze whether evidence exists from which a jury could find that Castello and/or Duchaine violated Tantlinger's Eighth Amendment rights. The Court will then address whether Hartley should bear any responsibility.

## A.    Castello

Tantlinger asserts against Castello what is sometimes called the "gatekeeper" theory of Eighth Amendment liability, whereby "prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Under this theory, however, the objective component of the Eighth Amendment test requires "substantial harm," meaning that the delay led to "lifelong handicap, permanent loss, or considerable pain." *Al-Turki*, 762 F.3d at 1193 (internal quotation marks omitted).

Castello claims that gatekeeper liability cannot apply to him because, every time Tantlinger requested permission to go to the clinic, he (Castello) called the on-duty nurse and was told that Tantlinger needed to wait for prescribed medication to take

effect.  (ECF No. 64 at 17–18.)  Castello states that he was entitled to rely on the on-duty nurse's assessment of the situation.  (*Id.* at 18 (citing *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006) ("reliance on the recommendations of a trained medical professional can disprove deliberate disregard")).)  In any event, says Castello, Tantlinger managed to visit the medical clinic despite Castello's alleged interference.  (*Id.* at 19.)

The first portion of Castello's argument rests on the assumption that he indeed contacted the on-duty nurse, and also that he accurately conveyed Tantlinger's symptoms to the nurse.  As noted in Part II.B, above, Tantlinger disputes that Castello ever conveyed (or fully conveyed) his complaints to the on-duty nurse.  The Court need not decide whether Tantlinger has evidence sufficient to raise a *genuine* dispute, however, because the second and third portions of Castello's argument raise a causation question that is ultimately dispositive.

"A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983."  *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000).  In this case, Tantlinger's but for causation theory (as explained by his expert) is as follows:

> The initial lack of referral by [CDOC] staff and resultant lack of response by a treating dentist on 9-20-12 [the day on which Castello allegedly first refused to permit Tantlinger to visit the medical clinic] set off a chain of events which ultimately led to the life threatening long-term intensive care treatment of Mr. Tantlinger and his debilitating vocal cord and tongue paralysis.  It is reasonable to expect that early and appropriate medicinal and/or surgical intervention by the dental staff during the first 24–48 hours post-operatively could have prevented the sequence of unfortunate events which occurred by arresting the infectious process and allowing for normal post-operative healing.  Early appropriate antibiotic coverage with possible localized

10

> debridement of the surgical wound and/or localized incision
> and drainage could have prevented the extensive
> disseminating infection . . . .

(ECF No. 74-7 at 4.)

This explanation focuses almost entirely on what medical staff failed to do. The only potential reference to non-medical staff is the statement about "[t]he initial lack of referral . . . on 9-20-12." This could be interpreted as a reference to Castello's alleged denial of permission to visit the clinic, although it could also be interpreted as the clinic's lack of immediate referral to a dentist—a referral the clinic could not have made on September 20 because Tantlinger was not permitted to come to the clinic. In either event, the effect is the same.

Even so, Tantlinger must be able to prove a causal connection between (a) Castello's alleged refusal on September 20 to permit a visit to the clinic and (b) the "lifelong handicap, permanent loss, [and] considerable pain," *Al-Turki*, 762 F.3d at 1193 (internal quotation marks omitted), that forms the basis of his claim. Thus, Tantlinger must have evidence from which a jury could conclude that, had Castello permitted him to visit the clinic earlier than his actual first post-operative visit (on September 22), the subsequent course of events would have been different. Stated another way, if Castello had visited the clinic earlier than September 22, would Tantlinger have received any better care than what he actually received on September 22? (ECF No. 74-7 at 4.)

Tantlinger presents no evidence that this would have taken place, or that any other course of events would have played out. Rather, the only evidence in the record of what clinic staff might have done is what they actually did on September 22, namely,

11

send Tantlinger back to his cell with ibuprofen.  In short, on this record, there would be

nothing from which a jury could conclude that, but for Castello's alleged obstruction on

September 20, the clinic would have taken steps to treat Tantlinger's infection

appropriately, thereby averting the acute pain and the progression of the infection, with

its lingering effects.[4]

Tantlinger claims that, later in the day on September 22, Castello again blocked

his access to the clinic.  But this runs into the same problem.  Assuming Castello

immediately permitted another clinic visit, the only available evidence of what the clinic

would have done at that point is what the clinic actually did the next day, September 23:

send Tantlinger to the emergency department.  And there, regrettably, he again

received treatment only for his symptoms, not for the underlying infection.

Tantlinger claims that Castello ignored further pleas for help on September 25.

Again, however, Tantlinger presents no evidence that, had Castello allowed him to

return to the clinic on September 25, the clinic would have treated him any differently,

or that his condition would have been materially better than when he actually returned

to the clinic on September 26.  Accordingly, even assuming that Castello behaved

---

[4] One could imagine an infection that causes acute, easily recognizable symptoms early on, then goes into apparent remission after two or three days, and then reappears with greater severity.  If Ludwig's angina normally progresses in this manner, Tantlinger might be able to claim that a clinic visit on September 20 would have likely prompted clinic staff to take more aggressive measures then, while a visit two days later—as actually happened—led to a different result.  But Tantlinger presents no evidence that Ludwig's angina progresses in this fashion.  Moreover, he repeatedly insists that he had "obvious signs of a serious dental infection" when he presented at the clinic on September 22.  (ECF No. 74 at 2–3, ¶¶ 5–6.)  One could also imagine that certain better-trained clinical staff were present on September 20 but not on September 22, and that those present on September 20 would have spotted the seriousness of Tantlinger's condition and would have taken steps such as those recommended by Tantlinger's expert.  But again, Tantlinger offers no evidence of that scenario.

precisely as Tantlinger believes he should have, there is no evidence from which a jury could conclude that Tantlinger would have avoided any of the unfortunate consequences he actually suffered.[5]

Moreover, Tantlinger's accusations regarding Castello's alleged indifference on September 22 and 25 are ultimately grounded in the assumption that Castello had a duty to override the decisions of the medical professionals who had already seen Tantlinger.  To be clear, the record does not establish whether Castello knew what the clinic or the Pueblo emergency department had diagnosed or prescribed.  But, had he immediately acted on Tantlinger's requests for assistance, he would have soon learned of those diagnoses and prescriptions (either because they had already been made, or, if they had not yet been made, because the only evidence in the record of what the various medical professionals would have done is what they actually did).  At that point, did Tantlinger have a duty to second-guess the medical professionals?

Tantlinger has not identified, nor could this Court locate, any Supreme Court or Tenth Circuit authority establishing such a duty, or even hinting at one.  This is highly significant from the perspective of qualified immunity, which "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)

---

[5] It is not necessary to view this from the perspective of what might have happened if *Castello* had permitted more clinic visits.  One could instead assume that Castello behaved with the vulgar indifference alleged by Tantlinger, but Tantlinger soon found another guard willing to permit a clinic visit.  Such a hypothetical raises the same causation problem because there is no evidence that the clinic would have treated Tantlinger's infection rather than his symptoms.

(internal quotation marks omitted).  "[F]or a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (internal quotation marks omitted).  Here, there is no on-point Supreme Court or Tenth Circuit decision, and the weight of authority from other circuits suggests that a duty to second-guess does *not* exist.[6]  Accordingly, to the extent Tantlinger asserts that Castello should have somehow ignored or overruled the medical judgment of the Facility clinic or Pueblo emergency department, Castello is entitled to qualified immunity based on that claim.[7]

This case would present a much closer call if Tantlinger had pursued his claims against members of the prison medical staff, but Tantlinger stipulated to dismiss the

_____

[6] *See, e.g.*, *Gordon*, 454 F.3d at 864 ("reliance on the recommendations of a trained medical professional can disprove deliberate disregard"); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) ("This is not to say that prison officials may substitute their judgments for a medical professional's prescription.  Of course they cannot."); *Burns v. Trombly*, 624 F. Supp. 2d 185, 204 (N.D.N.Y. 2008) ("The Eighth Amendment simply does not impose a duty on a correctional officer to second-guess (and, indeed, ignore) the medical judgment of a prison medical care professional, under such circumstances (if ever)."); *Riccardi v. Louis*, 2013 WL 5770668, at *6 (N.D. Fla. Oct. 24, 2013) ("Plaintiff was evaluated by medical professionals, they made a treatment decision, and it cannot be said that the correctional officer present, Defendant Sellers, subjectively disregarded a risk of serious harm to Plaintiff by failing to attempt to override the medical decisions of healthcare providers.").

[7] The Court need not and does not hold that a prison guard is *per se* justified in relying on medical professionals' judgment in all circumstances.  Perhaps a prison guard could still be culpably indifferent if he or she stood idly by while knowing that the medical staff itself was behaving with deliberate indifference toward a prisoner's obvious and undoubtedly critical medical condition (a severed limb, for example).  *Cf. Spruill*, 372 F.3d at 236 ("absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference").  But there is no evidence of a similar scenario here, and in any event, such a duty to act has never been clearly established, so qualified immunity would apply regardless.

only medical employee ever named as a defendant (Nurse Hanks).  To be sure, the Court cannot say with certainty that Tantlinger could have overcome summary judgment against a medical employee.  There would likely have been a serious question regarding whether Tantlinger's treatment rose above the level of simple malpractice.  *See Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996) ("Conduct which, at most, is medical malpractice redressable in state court does not represent cruel and unusual punishment.").  Nonetheless, at least Tantlinger's causation theory would have been directed at the proper defendants.

As for Castello, Tantlinger's claim fails for the reasons stated above.  Castello's summary judgment motion will be granted.

## B.    Duchaine

The analysis with respect to Duchaine is similar.  After the Medline nurse denied Tantlinger the antibiotics which he believed he had been prescribed, Tantlinger turned to Duchaine and said, "Is there a way you can bring my medicine?  I'm dying.  I need your help."  Duchaine allegedly responded, "I hope you fucking die.  Get your ass up to your house."  The question, then, is what would have happened had Duchaine (or any other guard) instead immediately tried to help Tantlinger.  The only evidence in the record of what might have happened is what actually happened—the nurse denied that Tantlinger had a prescription for antibiotics.

There is a dispute of fact whether Tantlinger received a prescription for antibiotics on his first visit to the emergency department (September 23).  Assuming Tantlinger had such a prescription, he has presented no evidence that being permitted to take those antibiotics on the evening of September 24 (when the incident with

15

Duchaine took place) would have forestalled or reversed any of the consequences that became apparent on September 26.  Thus, a jury would not have evidence from which it could find that Duchaine's alleged indifference caused any of Tantlinger's injuries.

In some circumstances, prison officials can be liable for prolonging a prisoner's pain, whether or not the prisoner suffers long-term medical consequences.  *See generally Al-Turki*, *supra*.  To the extent this is Tantlinger's theory—*i.e.*, that his pain was unnecessarily prolonged—it still fails.  Tantlinger alleges that he already had painkiller medication upon discharge from the tooth extraction.  (ECF No. 14 ¶ 13.)  His various clinic and emergency department visits resulted in prescriptions for even more powerful painkillers, but he insists that his pain continued to worsen.  (*See, e.g.*, ECF No. 74 at 3–6, ¶¶ 6, 7, 18.)  Thus, Tantlinger again lacks evidence that his pain would have been lessened had Duchaine (or Castello, for that matter) acted on his request(s) for help.

Duchaine also deserves qualified immunity to the extent Tantlinger believes that Duchaine should have found a way to obtain his medications despite the nurse's denial.  The parties dispute whether Duchaine actually heard the nurse's denial.  (*See* ECF No. 75 at 4, ¶ 4.)  However, if he had acted as Tantlinger thinks he should have, he would have quickly learned of that denial.  And at that point, he could have assisted Tantlinger to avoid further medical difficulties only by second-guessing the nurse.  No clearly established law imposes such a duty.

For all of these reasons, Duchaine's summary judgment motion will be granted.

## C.    Hartley

Tantlinger does not claim that Hartley personally ignored his pleas for help, or

was even aware of them.  Rather, he argues that Hartley violated his duty to train and supervise Facility staff.  (ECF No. 74 at 17–19.)

Supervisory liability is a sometimes-hazy concept.  In brief, it usually requires that the supervisor, acting or failing to act with a culpable state of mind, creates or perpetuates a formal or informal policy that leads subordinates to violate the plaintiff's constitutional rights.  *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  This could include, for example, a supervisor that knows his or her subordinates need better supervision and training because they are repeatedly violating constitutional rights in a particular way, but the supervisor deliberately chooses to do nothing about it. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1155 (10th Cir. 2006) (finding no supervisory liability because plaintiff failed to "offer[] any evidence that [the supervisor] turned a blind eye to evidence . . . such as a pattern or practice of constitutional abuses by his subordinates on prior occasions").

Inherent in the supervisory liability standard is that the supervisor can fairly be said to be the *cause* of the plaintiff's injury.  In that light, Tantlinger's claim against Hartley must fail for the same reasons as it failed against Castello and Duchaine. Tantlinger does not allege that Hartley failed to train the medical staff, but that he failed to train and discipline the guard staff.  (*See, e.g.*, ECF No. 74 at 10, ¶¶ 5–6; *id.* at 18–21.)  Even assuming this is true, and further assuming that Castello and Duchaine acted according to Hartley's "policy" of inaction, there is no causal connection between Castello's or Duchaine's behavior and Tantlinger's injuries, and therefore no causal connection between Hartley's alleged failure to train and Tantlinger's injuries.  Thus, Hartley's summary judgment motion must also be granted.

17

**D.**      **Eleventh Amendment Immunity**

The caption to Tantlinger's complaint states that Hartley is being sued "in his individual and official capacity" (ECF No. 14 at 1), but the body of the complaint does not allege any official-capacity claim against the Facility, CDOC, or the State of Colorado.  *Cf. Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." (internal quotation marks omitted)).  Nonetheless, Tantlinger's summary judgment response brief contains a footnote arguing that Hartley has "not moved to dismiss [his] official capacity claim," and that claim "should proceed to trial regardless of this Court's disposition of the Motions for Summary Judgment." (ECF No. 74 at 17 n.5.)  As to what that claim is, Tantlinger states that "a jury question exists as to whether [the Facility] has an unlawful custom, policy, or practice under *Monell*" (*id.*), referring to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

*Monell* only imposes liability on municipalities, not on state agencies such as CDOC (of which the Facility is a part).  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989).  The Eleventh Amendment continues to protect state agencies from claims for damages.  *See id*.  Hartley's failure to move specifically on these grounds (assuming he had fair notice) is immaterial because he raises it in his reply brief.  (ECF No. 83 at 14.)  *See Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1231 (10th Cir. 1999) ("the Eleventh Amendment defense has jurisdictional attributes" and "may be raised at any point"); *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) ("[i]n the absence of an unequivocal waiver specifically applicable to

federal-court jurisdiction, we decline to find that [the State] has waived its constitutional immunity"). The Court agrees with Hartley that it has no jurisdiction over any *Monell*-type claim against the Facility, CDOC, or the State of Colorado.

Tantlinger also argues that he may be entitled to "various forms of prospective injunctive relief," such as "a prohibition on retaliation against Tantlinger (he is likely to remain incarcerated at [the Facility] for significant time), mandatory training changes designed to reduce the possibility of future constitutional violations similar to the ones Tantlinger suffered, and an order mandating an apology to Tantlinger." (ECF No. 74 at 17 n.5.) Tantlinger, however, offers no basis to enter these sorts of injunctions where he cannot in the first instance prove his underlying claims against any individual actor.

Accordingly, to the extent Tantlinger asserted official-capacity claims against Hartley, the Court will grant summary judgment in Hartley's favor.

## IV. CONCLUSION

For the reasons set forth above the Court ORDERS as follows:

1. Defendants Hartley's and Castello's Motion for Summary Judgment (ECF No. 64) is GRANTED;

2. Defendant Duchaine's Motion for Summary Judgment (ECF No. 65) is GRANTED;

3. Tantlinger's claims against all Defendants, whether in their individual or official capacities, are DISMISSED WITH PREJUDICE;

4. The Final Trial Preparation Conference set for November 10, 2016, and the 5-day jury trial set to begin on November 28, 2016, are VACATED; and

5. The Clerk shall enter final judgment in accordance with this Order and shall

terminate this case.  Defendants shall have their costs.

Dated this 19th day of August, 2016.

BY THE COURT:

_____
William J. Martínez
United States District Judge